IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALDO ORTEGA,

                    Plaintiff,

v.                                                    Case No. 20-cv-36-NJR

TANYA FORD, JOSEPH BLAHA,
ENAITE AKPORE, JOSEPH PATE, and
ERNEST VANZANT,

                    Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Aldo Ortega, a former inmate of the Illinois Department of Corrections ("IDOC") who was placed on Mandatory Supervised Release ("MSR") on August 19, 2019, brought this case *pro se* pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights and Illinois law. Defendants Tanya Ford, Joseph Blaha, Enaite Akpore, Joseph Pate, and Ernest Vanzant now move for summary judgment (Doc. 67). Ortega, through counsel, filed a response in opposition to the motion (Doc. 75). Defendants filed a reply brief (Doc. 79).

### BACKGROUND

In 2012, Ortega was convicted for "possession of child pornography, reproducing and selling" (Doc. 67-1, p. 15). He received a four-year sentence, with the requirement to serve 50% of the sentence, and MSR of three years to life (*Id*. at pp. 15-16). Ortega was initially paroled in December 2013 (*Id*. at p. 17). He was subject to a number of conditions

on release, including having a parole site and abiding by all the rules, regulations, and the law. He was to refrain from contact with the victims and to attend offender treatment (*Id*. at p. 19). Prior to his release, he signed an MSR agreement agreeing to the conditions (*Id*.).

Ortega's original parole host site, his parents' home, was denied because his father got into an argument with the parole agent (*Id*.). Ortega obtained another host site at a family member's home and was released on December 16, 2013 (*Id*. at pp. 55-57). In April 2014, he resubmitted his parents' residence for approval and was allowed to move to his parents' home at that time (*Id*. at pp. 57-59).

Ortega testified that after moving into his parents' residence, there were constant issues between his parole agent and his parents (Doc. 67-1, p. 60). His father complained because he believed that Ortega would be able to have more freedom in movement to assist his parents with chores and shopping (*Id*. at p. 61). Ortega witnessed several verbal disagreements between the agents and his father (*Id*. at pp. 61-62). Ortega's father specifically argued with Blaha, Ortega's parole agent, about Ortega's ability to take his father to the hospital and grocery shopping (*Id*. at p. 62). Ortega's father also complained that Ortega was not able to leave the house to look for a job (*Id*.).

On August 5, 2015, Blaha completed a parole violation report (Doc. 67-2). The report indicated that a number of violations were found when Blaha and another agent conducted a face-to-face visit with Ortega. They had visited Ortega in order to locate an expired passport that Ortega indicated he had in his possession (*Id*. at p. 1). Ortega testified that he needed a new passport in order to sign up for school and had previously

asked Blaha to be allowed to leave his house to obtain a new passport from Walgreens (Doc. 67-1, pp. 68-70). He and Blaha had argued over the phone the day before the search because Blaha believed Ortega wanted the passport in order to escape (*Id.* at pp. 70-71). Ortega indicated he had an expired passport in his mother's possession (*Id.* at p. 73; 67-2, p. 1).

During the search, Blaha found a number of items in violation of Ortega's MSR agreement including DVDs, iPhones with internet access, alcohol, a PlayStation 3, and access to Wi-Fi (Doc. 67-2, pp. 1-3). In the report, Blaha noted that Ortega's parents were aware that the host site could not have alcohol, computers, internet, or Wi-Fi (*Id.* at p. 3). The agents also indicated their belief that Ortega sought a passport to flee the country (*Id.* at p. 2). Blaha observed that there were safety concerns at the home, noting that Ortega's father was upset during the search and displayed a wood rod in a threatening manner (*Id.* at p. 3). Ortega was taken into custody after the search. (*Id.* at p. 2). In the report, Blaha recommended that Ortega's parents' home be declared off limits as a future host site because the location was "not conducive to the rehabilitation of the offender and agent safety." (*Id.* at p. 3). The report noted several issues with the host site, going back to April 2014 (*Id.* at p. 2).

Ten days after being returned to custody, Ortega receive a parole violation report (Doc. 67-1, p. 79). He had a parole violation hearing in September 2015 (*Id.* at pp. 79-80). He was given at least two weeks' notice of the hearing (*Id.* at p. 80). After some initial questioning, a parole board member decided to continue the hearing to seek clarification on how to proceed (*Id.* at pp. 80-81). Ortega agreed to the continuance, and his hearing

was rescheduled for March 15, 2016 (*Id*. at p. 83). He received notice 30 days prior to the parole revocation hearing (*Id*.).

At the hearing, Ortega asked to be declared a violator, believing that if he was labeled a violator he could serve two years and be discharged from his parole requirements (Doc. 67-1, pp. 83-84). He told the parole board member that he did not have a host site other than his parents' house (*Id*. at 83-84). Ortega testified that he believed if he served out his full period of confinement, four years, he would be discharged from parole because another inmate told him that was how parole worked (*Id*. at p. 87).

The parole board informed Ortega he could not be declared a violator because Vanzant, the records office supervisor at Big Muddy Correctional Center ("Big Muddy"), sent a letter indicating that field services were working to find Ortega a proper host site for continuing MSR (*Id*. at p. 84). Ortega testified that he never had any contact with Vanzant other than to request a copy of the letter, which was refused (*Id*. at p. 85). Ortega recalled filing a grievance, and the Administrative Review Board denied his request for a copy of the letter, as he was not allowed access to information in the master files at the prison (*Id*. at p. 85).

After the hearing, on March 16, 2016, Ortega sent a request for his parents' house to be considered for his host site (Doc. 67-1, p. 89). His request was denied, and he was told he would need to submit a different address for placement (*Id*.). He did not submit a new address (*Id*. at p. 90). In October or November 2016, he had another hearing before the parole board (*Id*. at pp. 91-92). By that time, Ortega had transferred to Robinson

Correctional Center. Ortega was not able to coordinate having his parents at the hearing because he received only one weeks' notice of the hearing (*Id.* at pp. 92-93). Although given the opportunity to reschedule the hearing in order to allow for his parents' attendance, he declined (*Id.* at p. 93). Ortega informed the parole board member that he did not have a host site and, instead, he wanted to be declared a violator in order to finish out his sentence and be discharged completely (*Id.* at pp. 93-94). The board member declared him a violator and continued his release date until September 15, 2017 (*Id.* at p. 94). The confinement period was backdated to August 15, 2015, the date of his initial violation (*Id.*). Ortega was informed that he would still be subject to MSR because it remained in effect until discharged (*Id.*). The MSR would not be discharged by the completion of his sentence (*Id.* at p. 95).

After the hearing, Ortega resubmitted his parents' address as a host site. He believed that Tanya Ford sent him a request for a new host site, and he provided his parents' address (*Id.* at pp. 95-96). The request was again denied because the site had unsafe conditions (*Id.* at p. 97). Ortega believed that Tanya Ford informed him of the denial (*Id.*).

Ortega testified that he believed he became eligible for re-release on MSR on August 15, 2017, because he had served the remaining two years of the confinement period (Doc. 67-1, p. 98). He believed this because of what another inmate told him and acknowledged that no one from IDOC ever informed him that he would be released (*Id.* at p. 99). He again submitted his parents' address as a host site; it was denied (*Id.* at p. 100). After his release date passed, he received a notice of violations of his MSR (*Id.* at

p. 101). The violation report, dated August 7, 2017, indicated that Ortega lacked a suitable host site for his release (Doc. 67-4).

At the hearing, in either October or November 2017, Ortega was declared a violator but was informed he could be considered for release to MSR if he submitted a suitable host site (Doc. 67-1, pp. 105-106). After the hearing, he sent request slips inquiring as to why his parents' address was not approved, and they referred him back to the initial parole violation paperwork in which Blaha recommended against allowing Ortega's parents' home as a host site (*Id*. at pp. 106-108). Ortega believed that Tanya Ford responded to two of the four or five request slips he sent (*Id*. at pp. 107-109).

Ortega testified that he learned from other inmates that in order to obtain release to a halfway house, the halfway house would have to contact the institution, and the halfway houses did not contact the institution unless IDOC contacted them first (*Id*. at p. 109-110). His understanding was that IDOC did not contact a halfway house unless the halfway house contacted them (*Id*.). He never talked to anyone at IDOC or any staff at his prison about the possibility of a halfway house (*Id*. at p. 110).

Ortega eventually paroled from IDOC custody on August 15, 2019 (Doc. 67-1, p. 115). He had submitted a grievance requesting his parents' address as a host site (*Id*. at p. 116). Ortega believed he was released approximately five days after submitting the grievance (*Id*.).

Ortega also filed a grievance regarding Tanya Ford (*Id*. at p. 112). Ortega believed that Ford was a field services representative at Robinson Correctional Center (*Id*. at pp. 121-122). He had two or three face-to-face encounters with her in 2017. He signed

Page 6 of 16

paperwork in her presence about his parole, but he never talked with her about the denial of his host site (*Id*. at p. 123). His last encounter with her was on his release date when he signed paperwork in her presence (*Id*. at pp. 123-124). Ortega testified that Ford's job was to obtain addresses from the offender seeking parole and to place those addresses in the computer so that the location could be investigated by agents (*Id*. at p. 125). Ortega believed that she did not submit his parents' address on two occasions because she responded that the address would not be approved due to the initial parole violation report (*Id*. at pp. 125-126). He acknowledged that Ford never had contact with Blaha, as she based her responses solely on the 2015 parole violation paperwork (*Id*. at p. 127). On August 13, 2019, Ford emailed Enaite Akpore asking if Ortega's parents' address could be resubmitted for review (Doc. 67-5, p. 2). Akpore responded that another agent would re-investigate the proposed host site (*Id*. at p. 1).

Enaite Akpore was a parole supervisor at the Oakley parole office (*Id*. at pp. 127-128). Ortega met with her once in 2015 (*Id*.). He did not verbally communicate with her, nor did he have any written communication with her (*Id*. at pp. 128-129). Akpore issued the warrant for his arrest in 2017, despite Ortega being confined in IDOC custody at the time of the warrant (*Id*. at p. 129).

Joseph Blaha was Ortega's supervising agent during his 2014-2015 parole (*Id*. at p. 130). His last interaction with Blaha was in August 2015 when he arrested Ortega for parole violations (*Id*. at pp. 131-132). Ortega testified that other parole and prison officials used Blaha's parole violation report to deny Ortega's host site, which kept him confined in IDOC custody (*Id*. at p. 132).

Ortega only knew Joseph Pate by name (*Id*. at p. 133). Ortega testified that he never met Pate in person, but he

believed that Pate was a supervising agent like Blaha. Ortega testified Pate made statements in the 2017 parole violation report that he should not have made because they were untrue, and Pate was only allowed to allege violations against individuals he personally supervised (*Id*. at p. 134). Pate signed Ortega's 2017 parole violation report on August 4, 2017 (Doc. 67-4, p. 2).

Ortega also sent request slips to Ernest Vanzant (Doc. 67-1, p. 135). He never met Vanzant face-to-face but sent a request slip when Vanzant was supervisor of records at Big Muddy (*Id*. at pp. 135-136). He asked for a copy of the letter sent to the parole board member (*Id*. at p. 136). Ortega believed that Vanzant should not have written a letter directing the parole board member to refrain from finding Ortega guilty of the parole violations in 2015 (*Id*.). Vanzant did not participate in any review or approval of Ortega's host site, and his job was to maintain records at Big Muddy (*Id*. at p. 137-138).

On January 9, 2020, Ortega filed his Complaint alleging various claims related to Defendants' refusal to approve his proposed MSR residential placement and for failing to assist him in finding an alternative placement. After a review of the claims pursuant to 28 U.S.C. § 1915(a)(1), he was allowed to proceed on the following eight counts:

Count 1:    Ford, Blaha, Akpore, Pate, and Vanzant subjected Ortega to cruel and unusual punishment in violation of the Eighth Amendment by their actions or omissions that resulted in the continuation of his IDOC confinement and denial of release on MSR while he had an approved host site at his parents' home, which subjected Ortega to four years of additional incarceration.

Count 2:    Ford, Blaha, Akpore, Pate, and Vanzant violated Ortega's right to substantive due process under the Fourteenth Amendment by their actions or omissions that resulted in the rejection of his proposed MSR host site, denial of release on MSR to his parents' home, and/or failure to investigate alternative MSR host sites.

Count 3:    Ford, Blaha, Akpore, and Pate violated Ortega's right to procedural due process under the Fourteenth Amendment by their actions or omissions that resulted in the rejection of his proposed MSR host site, denial of release on MSR to his parents' home, and/or failure to investigate alternative MSR host sites.

Count 4:    Akpore and Pate violated Ortega's right to equal protection under the Fourteenth Amendment by their actions or omissions that resulted in the rejection of his proposed MSR host site and denial of release on MSR to his parents' home.

Count 5:    Ford, Blaha, Pate, and Vanzant violated Ortega's due process and/or equal protection rights under the Illinois Constitution, Article 1, sec. 2, and his right to remedy and justice under Article 1, sec. 12, by their actions or omissions that prevented his release on MSR to his parents' home.

Count 6:    Akpore and Pate violated the warrant clause of the Fourth Amendment by issuing or requesting an MSR violation warrant for Ortega on or about August 4, 2017, even though Ortega was in custody at Robinson.

Count 7:    Pate violated the warrant clause of the Illinois Constitution, Article 1, sec. 6, by requesting issuance of a warrant for Ortega on or about August 4, 2017, even though Ortega was in custody at Robinson.

Count 8:    Ford, Blaha, Akpore, Pate, and Vanzant's actions or inactions violated Illinois state laws including assault, false imprisonment, and/or conspiracy.

(Doc. 17).

Defendants Ford, Blaha, Akpore, Pate, and Vanzant now move for summary

judgment, raising a number of grounds, including absolute immunity, the statute of limitations, *res judicata*, and arguing that the claims are barred by the doctrine established in *Heck v. Humphrey*, 512 U.S. 477 (1994) (Doc. 67). In the alternative, they argue that they are entitled to summary judgment on the merits of Ortega's numerous claims.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing Fed. R. Civ. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

ANALYSIS

### A. Section 1983 Claims

Simply put, Ortega's claims are barred by the holding in *Heck v. Humphrey*. In *Heck*, the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a [Section] 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a statute tribunal authorized to make such determination, or called in question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Heck*, 512 U.S. at 486-87. "A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under [Section] 1983." *Id*. Thus, "when a state prisoner seeks damages in a [Section] 1983 suit, the district court must consider whether a judgment in [his] favor…would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id*. at 487. "The *Heck* bar accounts for the preclusive effect of state court criminal judgments on civil litigation by lifting the bar only when the plaintiff has achieved a favorable termination of the criminal proceeding." *Savory v. Cannon*, 947 F.3d 409, 419 (7th Cir. 2020). *Heck* has been extended to cover "state procedures that determine the length of the sentence (as by granting or revoking good-time credits)." *Wells v. Caudill*, 967 F.3d 598, 601 (7th Cir. 2020) (citing *Edwards v. Balisok*, 520 U.S. 641 (1997)).

In order to pursue a Section 1983 claim, a plaintiff must first obtain a "favorable

Page 11 of 16

termination" for the proceedings being challenged. In *Savory*, the Seventh Circuit recognized that the "good faith but unsuccessful pursuit of collateral relief does not relieve [a prisoner] of *Heck*'s favorable termination requirement." *Savory*, 947 F.3d at 426. The Seventh Circuit "established a bright line rule: A 42 U.S.C. § 1983 claim which implies the invalidity of a conviction or sentence cannot proceed until *Heck*'s favorable termination requirement is satisfied, regardless of the availability of collateral relief or the diligence in pursuing that relief." *Whitfield v. Althoff*, Case No. 13-cv-3192, 2020 WL 4275256, at *2 (C.D. Ill. July 24, 2020).

As to whether *Heck* bars the claims in this case, Ortega argues that there are issues of fact as to whether *Heck* applies. But even taking the facts in the light most favorable to Ortega, Ortega testified that his claims related to the revocation of his supervised release. He testified that his claims against Blaha focused on the 2015 parole violation report (*Id.* at pp. 132-133). His claims against Pate and Akpore stemmed from the 2017 parole violation report (*Id.* at p. 129, 134). He testified that Pate improperly made statements in the report which resulted in his continued imprisonment and that Akpore improperly issued an arrest warrant while he was still in prison (*Id.*). His claims against Vanzant relate solely to the letter he wrote prior to the March 2016 parole hearing, which initially kept him from being found in violation of his parole (*Id.* at p. 136). His claims against Tanya Ford stem from her receipt on two occasions of his proposed parole sites (*Id.* at p. 125). Defendants' alleged actions and inactions resulted in Ortega being labeled a violator of his MSR terms and his supervised release being revoked.

Ortega's MSR is part of his sentence. *United States v. Haymond*, 139 S.Ct. 2369, 2379

(2019); *United States v. Leiva*, 821 F.3d 808, 821 (7th Cir. 2016) ("Supervised release is part of the overall sentence."); *Lee v. Findley*, 835 N.E. 2d 985, 988 (Ill. App. 4th Dist. 2005) (parole/mandatory supervised release is a continuation of custody and part of the sentence); *Stepney v. Johnson*, No. 14 C 3548, 2016 WL 5720367, at * 5 (N.D. Ill. Oct. 3, 2016) (a sentence is discharged only when the inmate completes his MSR term; the inmate remains in the legal custody of the IDOC while on MSR, regardless of whether they are in IDOC's physical custody). And a judgment in his favor on his current claims would necessarily imply the invalidity of that sentence. He argues that because of Defendants' actions and inactions, he was prevented from utilizing his parents' address as a host site and was labeled a violator for lacking a proper host site. This led to the wrongful detainment beyond his scheduled release on MSR. Further, he alleges Akpore and Pate improperly submitted a warrant for an alleged parole violation while Ortega was still confined in IDOC, which also led to him being found in violation and being detained in custody.

Ortega argues that he is not challenging the length or validity of his sentence but is instead attacking the handling of the host site process, citing to *Murphy v. Raoul*, 380 F. Supp. 3d 731 (N.D. Ill. Mar. 31, 2019). In *Murphy*, the plaintiffs challenged the host site procedures themselves, seeking to change the process to determine their conditions of confinement. *Id*. at 750. But here, Ortega attacks the actions of specific individuals, arguing that their actions or inactions caused him to be labeled a violator and have his supervised release revoked. A judgment in favor of Ortega would mean the revocation of his supervised release in 2015 and 2017 was invalid and he, indeed, was wrongfully

detained. *See Courtney v. Butler*, Case No. 16-cv-1062-NJR, 2021 WL 3619862, at * 4 (S.D.

Ill. Aug. 16, 2021). Thus, his Section 1983 claims, including his claims in Counts 1, 2, 3, 4,

and 6, are barred by *Heck*. They are, accordingly, **DISMISSED without prejudice**. *Johnson*

*v. Rogers*, 944 F.3d 966, 968 (7th Cir. 2019).

### B. Remaining State Law Claims

This leaves only Ortega's state law claims in Counts 5, 7, and 8. Count 5 and 7

allege violations of the Illinois Constitution, and Count 8 alleges various state law

allegations including assault, false imprisonment, and conspiracy. Defendants failed to

include any arguments regarding these claims, and Ortega has not offered any allegations

or arguments as it relates to these claims. The basis for the Court's subject matter

jurisdiction in this case is 28 U.S.C. § 1331, which grants federal district courts original

jurisdiction over cases "arising under the constitution, laws, or treaties of the United

States." 28 U.S.C. § 1331. This jurisdiction stems from Ortega's Section 1983 claims. The

Court's jurisdiction over Ortega's state law claims lies in supplemental jurisdiction, as

codified in 28 U.S.C. § 1367, which extends the subject matter jurisdiction of federal

district courts to all claims that form the same case or controversy as the federal claims.

*See City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 164-65 (1997).

There are several situations enumerated in 28 U.S.C. § 1367 in which it is

appropriate for a court to decline to exercise supplemental jurisdiction. One of these

situations is when the district court "has dismissed all claims over which it has original

jurisdiction." 28 U.S.C. § 1367(c)(3). Normally, the federal court is expected to relinquish

jurisdiction of supplemental state-law claims when the federal claims are disposed of

prior to trial. *Walker v. McArdle*, 861 F. App'x 680, 687 (7th Cir. 2021) (It is "presume[d] that a district court will relinquish jurisdiction over supplemental state-law claims when no federal claims remain in advance of trial."); *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (citation and internal quotation marks omitted). Exceptions to this general rule exist "when (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Sharp Elecs.*, 578 F.3d at 514–15 (citation and internal quotation marks omitted).

None of the exceptions apply in this case. As Ortega points out in his response, the statute of limitations did not accrue until his release from IDOC custody on August 15, 2019. *See Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018). Further, both federal and Illinois statutes allow for tolling in this case. 28 U.S.C. § 1367(d); 735 ILCS 5/13–217 (giving plaintiffs one year or the remaining period of limitation, whichever is greater, to refile a state law claim that was dismissed by a federal court for lack of jurisdiction). The summary judgment motion in this case also focused solely on the federal claims, meaning substantial judicial resources have not been expended as to the remaining state law claims. *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008). Finally, the Court is not prepared to say that the proper resolution of the remaining state law claims is absolutely

clear. Thus, the Court relinquishes jurisdiction of the remaining state law claims.

C<span>ONCLUSION</span>

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED** as to Counts 1, 2, 3, 4, and 6 because the claims are barred by *Heck*. Those claims are **DISMISSED without prejudice**. The Court further relinquishes jurisdiction of the remaining state law claims (Counts 5, 7, and 8), and those claims are **DISMISSED without prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

**DATED:   March 27, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**